[No. 18522-5-I. Division One. January 8, 1988.]

*In the Matter of the Estate of*
ERNEST J. EUBANK.

KERMIT S. LIGHTER, ET AL, *Appellants,* v. KATHARIN REESE MARVIN, ET AL, *Respondents.*

*Janet A. Irons* and *Diamond & Sylvester*, for appellants.

*H. Scott Holte, Jeffrey H. Capeloto, Anderson, Hunter, Dewell, Baker & Collins, P.S., Henry T. Newton,* and *Newton, Newton, Kight, Hammer & Adams,* for respondents.

REVELLE, J.*—Kermit Lighter, Roberta A. Bush, Charles E. Lighter, Lois Shrader and Willard C. Lighter appeal the trial court's invalidation of the 1984 wills of Ernest and Elva Eubank and its award of attorney's fees to respondents. Appellants and respondents both seek attorney's fees on appeal. We affirm, but remand to the trial court for an evidentiary hearing on attorney's fees on appeal.

Ernest Eubank died on October 1, 1984, while he and his wife were residents of Madeleine Villa Convalescent Center. Olympic Bank, which had been managing the majority of the Eubanks' assets pursuant to a living trust executed in 1970, sought on October 31, 1984, to be appointed as special administrator of Ernest's will and requested that the court determine which of two sets of wills (1977 and 1984) executed by Ernest and Elva were valid, so that Ernest's will could be admitted to probate. An order so appointing Olympic Bank was entered on November 15, 1984.

On April 9, 1985, a petition was filed for probate of the later (September 8, 1984) will, supported by affidavits of

---

*Judge George H. Revelle is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

the attesting witnesses, a third witness, and the notary present at the execution of the 1984 will.

The issue before the court was the testamentary capacity of Ernest and Elva at the time of execution of the 1984 will and the possibility of undue influence exerted by Kermit Lighter, Elva's brother. Both Ernest's and Elva's wills were at issue because Elva had been adjudged incompetent and a guardian for her estate had been appointed. The Eubanks' estate consisted of residential real estate in Snohomish County and the living trust managed by Olympic Bank, estimated to be worth approximately $800,000.

The 1977 reciprocal wills of Ernest and Elva left two charitable bequests, $20,000 each to Roberta Bush (Elva's sister) and Kermit Lighter, $5,000 to Sarah Olson Katzmarck, and $5,000 to Lynnette Olson. The residuary estate was bequeathed one–half to Dr. J. E. Marvin (Ernest's first cousin) and the remaining one–half to Marvin's six children. Ernest and Elva had no children of their own. Shortly after the execution of the 1977 wills, Dr. Marvin died, and Ernest executed a codicil substituting Dr. Marvin's wife, Katharin Reese Marvin, as one–half residuary legatee. The record does not indicate whether Elva executed a codicil or not.

The 1984 reciprocal wills significantly changed the structure of the distribution. They gave an additional charitable bequest, and gave a china cabinet to a former neighbor. Further, the wills removed Katharin Marvin and her children as residuary legatees and substituted Kermit Lighter as 50 percent residuary legatee, Roberta Bush as 20 percent residuary legatee, and Elva's other two brothers and sister and residuary legatees at 10 percent each. The bequests to Lighter and Bush were removed, as were the bequests to Sarah Katzmarck and Lynnette Olson. Katharin Marvin was given a bequest of $40,000, and each of her children was given $10,000.

At trial, Katharin Marvin and her family were the petitioners to invalidate the 1984 will, and Kermit Lighter and his siblings were the respondents. The testimony presented

by Marvin concerned the drafting and execution of the 1984 wills.

In June 1984, Ernest (then 86 years old) fell and broke his hip. He was hospitalized for this condition and received a hip prosthesis. On July 10, 1984, he was moved to a nursing home, Madeleine Villa, where he was a resident until his death. At the suggestion of the Eubanks' physician, Dr. Ebert, who had treated them both since approximately 1955, Elva was admitted to the nursing home as well.

Dr. Ebert testified that he had diagnosed Elva as early as 1981 as suffering from senile dementia, or Alzheimer's–like syndrome. Dr. Ebert testified that by June 1984, he felt that Elva was unable to care for herself and was not oriented as to time, place, and self. Dr. Ebert had prescribed Haldol and Mellaril, both tranquilizers, for Elva.

Dr. Ebert further testified that as of September 8, 1984, in his opinion, Elva was not competent to understand a legal document, or to engage in its execution, that she was not competent to comprehend the nature and extent of her holdings, and that he was not confident that Elva could know the "objects of her bounty".

Dr. Ebert testified that following surgery, Ernest, who also suffered from diabetes, became confused, disoriented and agitated, for which Dr. Ebert prescribed Haldol. Dr. Ebert further testified that as of September 11, 1984, a date on which he examined Ernest and 3 days after the execution of the 1984 wills, Ernest was not competent, could not understand or execute a legal document, and could not comprehend the nature and extent of his holdings, nor the "objects of his bounty". Dr. Ebert's testimony with respect to Ernest was corroborated by that of Dr. Thomas Murphy, a neurologist, who was called in at the time to consult with Dr. Ebert.

After Ernest's fall in June of 1984, Kermit traveled to Washington from his home in Oregon to be with his sister. He stayed until September 9, 1984. Kermit obtained a general power of attorney from the Eubanks on July 12, 1984. Kermit testified that he had no knowledge of the contents

of the 1977 wills, nor the extent of the Eubanks' holdings, until after he obtained the power of attorney and reviewed the Eubanks' records.

James Simonton, then the Eubanks' trust officer at Olympic Bank, was contacted by Kermit sometime in August or early September 1984. Kermit told Simonton the Eubanks wanted to change their wills, so he needed the name of the attorney who had drafted the earlier wills. Simonton referred Kermit to William Ingram, who, after checking with Simonton, proceeded to make the changes requested by Kermit on September 4, 1984.

Ingram testified that it was his understanding that the documents drawn up were merely drafts (although not so stamped), to be reviewed by Simonton and the Eubanks, before his office would supervise their execution. However, Kermit picked up the documents on Friday, September 7, 1984, and personally arranged for two witnesses and a notary to be at the nursing home on Saturday, September 8, 1984, at which time Ernest and Elva signed the wills. Kermit acknowledged at trial that, prior to signing the new wills, neither Ernest nor Elva read them, nor were the wills read to the couple.

Prior to leaving for Oregon, Kermit presented Simonton with the newly executed wills on September 10, 1984, and asked Simonton to give him the 1977 wills, which Simonton declined to do. Simonton then contacted Dr. Ebert on September 11, 1984, and they made arrangements to visit the Eubanks together. Although Simonton had seen the Eubanks once every 2 months prior to the accident, neither Ernest nor Elva recognized Simonton, nor did they recognize Dr. Ebert. Simonton, who is a lawyer, testified that, in his professional opinion, neither of the Eubanks had sufficient mind or memory to understand a complicated legal document, or to know the extent of their property, or to know the "objects of their bounty".

Simonton also contacted Ingram, and together they visited the Eubanks on September 26, 1984. Ingram attempted to engage the Eubanks in conversation regarding

their testamentary intentions, but was unable to do so. Ingram testified that he was unable to say for certain whether or not Elva had sufficient mind or memory to understand a legal document. However, Ingram testified that in his opinion, Ernest did not have the capacity to understand a will.

Theresa Scofield, former Director of Nursing Services at Madeleine Villa, testified via deposition that both Eubanks suffered from "alteration in thought processes" upon admission, a condition which deteriorated during their stay. Scofield testified that, in her professional opinion, neither was competent to execute a will because they could not understand a legal document, could not comprehend the nature and extent of their holdings, nor could they recognize the "objects of their bounty".

In response, the Lighter family presented the testimony of the two attesting witnesses, and a neighbor, who all testified positively as to abilities of Ernest and Elva to talk about everyday matters and gardening. On cross examination, over the Lighters' counsel's objection, one of the witnesses was asked whether awareness that neither of the Eubanks had read the wills would have affected his willingness to sign as an attesting witness. The witness testified he would not have acted as an attesting witness if he had known that neither had seen the wills they signed. Lighter also presented the testimony of a physician who had reviewed Ernest's medical records, who testified that Ernest's confusion following his operation should have been merely transient, not permanent.

The trial court found that the petitioners (Marvins) established by clear, cogent and convincing evidence that Ernest did not possess testamentary capacity on September 8, 1984, based primarily on the testimony of Dr. Ebert, Nurse Scofield, Simonton, and Ernest's medical records. However, the court found that the petitioners did not sustain the burden with respect to Elva, although the evidence gave rise to a strong suspicion.

With regard to undue influence, the court concluded the evidence was clear, cogent and convincing that undue influence was exerted upon both Eubanks by Kermit. Judgment and findings and conclusions were entered on April 28, 1986, invalidating the 1984 wills and admitting the 1977 will to probate, and settling the estate of Elva as an incompetent. Judgment was entered on June 17, 1986, ordering Kermit and his siblings to pay the Marvins' costs and attorney's fees in the amount of $18,136.20. This appeal timely followed.

## TESTAMENTARY CAPACITY

By statute, a will may be made by any adult of sound mind. RCW 11.12.010. A will contest focuses on the issues of testamentary capacity, undue influence, or fraudulent misrepresentation as to the will's execution.

 The law presumes the validity of a rational will. As stated in *In re Estate of Bottger,* 14 Wn.2d 676, 685, 129 P.2d 518 (1942):

> [W]here a will, rational on its face, is shown to have been executed in legal form, the law presumes that the testator had testamentary capacity and that the will speaks his wishes.

In order to overcome a will, the evidence must be clear, cogent and convincing. *In re Estate of Johanson,* 178 Wash. 628, 35 P.2d 52 (1934); *In re Estate of Reilly,* 78 Wn.2d 623, 479 P.2d 1 (1970).

On appeal, where the trial court has weighed the evidence, review is limited to ascertaining whether the findings of fact are supported by substantial evidence and, if so, whether the findings support the conclusions of law and the judgment. *Morgan v. Prudential Ins. Co. of Am.,* 86 Wn.2d 432, 545 P.2d 1193 (1976). Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. *In re Snyder,* 385 Wn.2d 182, 532 P.2d 278 (1975).

 In reviewing the sufficiency of evidence to support a trial court's findings of fact, the appellate court determines

only if the findings are supported by substantial evidence, no matter what the burden of proof. *San Juan Cy. v. Ayer*, 24 Wn. App. 852, 604 P.2d 1304 (1979). However, the determination must be made in light of the degree of proof required. If the proof required is clear and convincing, then the question on appeal is whether there is substantial evidence to support the findings in light of the "highly probable" test. *In re Sego*, 82 Wn.2d 736, 513 P.2d 831 (1973).

The test for testamentary capacity was stated by the Washington Supreme Court in *In re Estate of Bottger, supra* at 685 as follows:

> [A] person is possessed of testamentary capacity if at the time he assumes to execute a will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty. This is the standard by which courts must measure the facts of each case in which it is contended that an instrument offered or accepted as the will of a decedent was executed at a time when the testator lacked capacity to make a valid testamentary disposition of his property.

Evidence challenging testamentary capacity usually consists of medical testimony, testimony of attesting witnesses, and testimony of other lay witnesses. M. Reutlinger & W. Oltman, *Washington Law of Wills and Intestate Succession* 71–73 (1985).

With respect to medical testimony, it has been held that special consideration should be given to the opinion of the attending physician. *In re Estate of Reilly, supra; see also Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 395 P.2d 633 (1964). Although medical testimony and the testimony of attesting witnesses are most commonly given, any testimony that is credible, internally consistent and supported by other similar evidence is admissible to determine testamentary capacity. M. Reutlinger & W. Oltman, at 73.

■ All three categories of medical, attesting, and lay testimony were presented at trial, although several of the

lay witnesses were attorneys familiar with the makers of the wills. The petitioners' witnesses testified that in their professional opinions, Ernest was not able to understand the legal document and was not able to recollect the "objects of his bounty". This raises a presumption of testamentary incapacity. *White v. White*, 33 Wn. App. 364, 655 P.2d 1173 (1982). The evidence by attesting witnesses concerning the ability of the Eubanks to talk about everyday matters and gardening is insufficient to overcome a determination that the trial court's finding on this issue is supported by substantial evidence using the "highly probable" test of clear, cogent and convincing evidence.

## UNDUE INFLUENCE

 The quantum of evidence necessary to show undue influence is also clear, cogent and convincing. *In re Estate of Smith*, 68 Wn.2d 145, 411 P.2d 879, 416 P.2d 124, 19 A.L.R.3d 559 (1966). As noted above, the standard of review is substantial evidence to support the findings. The Washington Supreme Court in *Dean v. Jordan*, 194 Wash. 661, 79 P.2d 331 (1938) set forth the appropriate test for undue influence. The *Dean* court stated that to overturn a will, there must be something more than mere influence. There must have been an undue influence at the time of the testamentary act which interferes with the free will of the testator and prevents the exercise of judgment and choice. *Dean*, at 671. Certain facts and circumstances surrounding the execution of a will can be of such force as to raise a suspicion against the will's validity. According to the *Dean* court, the most important of these are:

> (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. . . .

*Dean*, at 672. Other factors which bear on the question of whether undue influence was exerted include:

> the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the

testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will. . . .

The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient to overthrow the will.

*Dean,* at 672.

Kermit occupied a fiduciary or confidential relationship to the testator. He was Elva's brother and had also obtained a general power of attorney from both Eubanks. There is no doubt that Kermit actively participated in the preparation *and* procurement of the will, from initiating the draft to the execution of the documents.

As for the third factor concerning whether Kermit would receive an unusually large part of the estate under the new will, it may be argued that his share was to be no larger than that portion given to Katharin Marvin under the 1977 will. However, the trial court was examining the large increase from Lighter's $20,000 bequest in the 1977 will to his one–half share of the residuary estate in the 1984 will. Similarly, Kermit's increase resulted in a significant decrease for Katharin Marvin and the members of her family.

Turning to the other factors set forth by the *Dean* court, it is obvious that Ernest and Elva were of an advanced age and were of uncertain health and mental vigor. The relationship factor, however, does not figure significantly in the facts, given that Kermit, as Elva's brother, was certainly likely to be an object of the Eubanks' bounty. It is obvious, however, that Kermit, holding general power of attorney, and being the sole relative present, had sufficient opportunity to exercise undue influence.

The last factor presented by the *Dean* court concerns the naturalness or unnaturalness of the will. While it may be true that the dispository scheme of the 1984 will is, on its face, no more "unnatural" than the 1977 will, the 1984 will completely changed the way in which the estate would be distributed. The fact that the new residuary legatees under

the 1984 will were all elderly persons ranging in age from 76 to 93 suggests a certain unnaturalness of the will. The inference can be drawn that Kermit, who was the 76–year–old, may have hoped to benefit from the deaths of his siblings. In addition, Kermit hurriedly carried out the signing of the wills. Therefore, the record clearly supports the finding and conclusion of the trial court as to undue influence.

Appellants argue, in addition, that the following errors occurred at the trial court level:

Allowing respondents' counsel to question attesting witness Jones hypothetically while not permitting Kermit to testify as to his conversations with the Eubanks;

Entering findings of fact 1, 2, 8 and 18.

We have examined each claimed error and do not find that the trial court abused its discretion with respect to these matters which, except for one minor conceded error, would, considering all the evidence in the case, be harmless.

## ATTORNEY'S FEES

Appellants argue that the trial court erred in awarding attorney fees to respondents. RCW 11.96.140 reads as follows:

Costs. Either the superior court or the court on appeal, may, in its discretion, order costs, including attorneys fees, to be paid by any party to the proceedings or out of the assets of the estate, as justice may require.

When the decision or order of the trial court is a matter of discretion, it will not be overturned on review except on a clear showing of abuse of that discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 482 P.2d 775 (1971). The trial court below awarded attorney's fees to the prevailing party after finding that the opposing party exerted undue influence. We find that attorney's fees were properly awarded below.

In addition, both appellants and respondents seek attorney's fees on appeal. RCW 11.96.140 also authorizes such an award of attorney's fees. We find the affidavit submitted

by respondents' counsel on the issue of attorney's fees to be inadequate. Rather than setting forth the expenses incurred and services performed by counsel, this affidavit appears to be instead a facsimile of the attorney's fee statement to the respondents. Finding this affidavit to be inadequate, we remand to the trial court with instructions to hold whatever type of hearing it deems necessary to determine an appropriate award of attorney's fees to respondents on appeal. We make no award of attorney's fees to appellants.

SWANSON and WILLIAMS, JJ., concur.