[No. 30008-1-III.   Division Three.   September 11, 2012.]

*In the Matter of the Estates of* HARVEY L. JONES ET AL.

596

*Tom Scribner* (of *Minnick-Hayner*), for appellants.

*Michael R. Tabler* (of *Paul Lauzier Foundation*), for respondent.

¶1 KORSMO, C.J. — This contest over the family farming operation pits two sisters against two brothers. We conclude that the trial court correctly determined that there was insufficient evidence of undue influence to proceed to trial and affirm the trial court's order granting summary judgment.

## FACTS

¶2 Harvey Jones and Mildred Jones had four children: Will Jones, Dennis Jones, Teresa Engbretson, and Mary Ann Sealock.[1] Harvey and Mildred were farmers in Yakima County, where they owned 178 acres of orchard and crop land. They also owned 139 shares of Harvey L. Jones Farms Inc. (HLJ), a corporation that owned 54 acres of orchard and crop land. Will and Dennis owned the remaining 66 shares

---

[1] For convenience and clarity, first names or descriptions (brothers, sisters) are used to refer to the various members of the Jones family involved in this litigation. No disrespect is intended.

of HLJ, which was operated by Harvey, Will, and Dennis. Will and Dennis each also owned their own orchard and farmland that was farmed by HLJ. After experiencing financial difficulties, HLJ obtained financing from the Farm Service Agency (FSA). The FSA loan was funded in early 2003, and payment of the FSA loan to HLJ was personally guaranteed by Harvey, Mildred, Will and his wife, and Dennis and his wife. All parties also were required to pledge their personally owned farmland as collateral.

¶3 On February 21, 2003, Harvey, Mildred, Will and his wife, and Dennis and his wife signed a Farming Agreement. The Farming Agreement provided in part:

> That all parties will continue to own and/or lease their agricultural real and personal property (land, equipment, crops and receivables thereof) to Harvey L. Jones Farms, Inc. until all indebtedness is retired.

Clerk's Papers (CP) at 275. The parties also agreed that the corporation would not pay rent and would receive all income from the joint farming effort.

¶4 Harvey and Mildred had reciprocal wills that were executed in 1995. Upon the death of one of the spouses, all property owned by the decedent was to go to the surviving spouse, with most of the property to be put in trust for the benefit of the surviving spouse, who was named as the trustee. Upon the surviving spouse's death, both wills provided that the estate would go to the four children "share and share alike." CP at 48, 304.

¶5 Harvey died on May 24, 2003. On August 4, before Harvey's will was admitted to probate, Will and Dennis, with the assistance of their financial advisor Eric Weinheimer, had Mildred sign multiple documents, referred to by the parties as the "2003 documents."[2] These documents

---

[2] The three documents at issue were all signed by Mildred twice, once in her individual capacity and once as the "trustee of the Testamentary Trust of Harvey L. Jones." However, at the time of signing there was no Harvey L. Jones Testamentary Trust.

included (1) Agreement Between Shareholders for Transfer of Stock by Gift, (2) Right of First Refusal, and (3) Agricultural Property Lease-Option. Under the Agreement Between Shareholders for Transfer of Stock by Gift, Mildred gifted to Will and Dennis the 139 shares of HLJ that she and Harvey had owned as their community property. Under the Agricultural Property Lease-Option, Mildred agreed to lease the 178 acres (from community property) to Will and Dennis personally for $50,000 per year for 16 years, for a total of $800,000. If Will and Dennis elected to buy the property, the purchase price was $800,000 and "the base lease payments of $50,000 per year paid by Lessee under the Lease will be applied as a reduction to the Purchase Price on closing." CP at 247.

¶6 The Harvey Jones will was admitted to probate on January 16, 2004, and Mildred was appointed the personal representative. The will directed that a trust be established for the benefit of Mildred, with Mildred as the trustee, but the trust was never established.

¶7 Mildred died on July 17, 2007. Will Jones was appointed the personal representative of Mildred's estate, as well as successor personal representative of the Harvey Jones estate. As personal representative, Will hired an appraiser to appraise the 178 acres of farmland owned by Harvey and Mildred. The appraisal report dated November 8, 2008 valued the property at $1,050,000 as of May 24, 2003.

¶8 On November 24, 2007, Teresa and Mary Ann filed a creditor's claim against Mildred's estate, alleging that Mildred breached fiduciary duties causing money damages when she entered the agreements to gift Harvey's community property interest in the stock and to lease Harvey's community property interest in the farmland. They also alleged that as to Mildred's community property interest in these transactions, they were entitled to money damages from her estate resulting from fraud, undue influence, misrepresentation, and mental incompetency. On December

7, 2007, Will and Dennis filed a creditor's claim. Teresa and Mary Ann also filed a petition under the Trust and Estate Dispute Resolution Act (TEDRA), chapter 11.96A RCW, on January 14, 2010, seeking rescission of the 2003 agreements. Their theories of rescission were largely the same ones asserted in their creditor's claim.

¶9 In December 2009, Will and Dennis formed Jones Farms LLC. On January 8, 2010, Will filed an Intention to Exercise Option, proposing to sell the 178 acres of farmland to Jones Farms LLC for a purchase price of $285,389.13 and an assumption of debt (to MetLife and FSA) totaling $185,417.87.

¶10 On January 29, 2010, the two estates filed a motion for summary judgment, seeking dismissal of all claims. The estates argued that the TEDRA rescission claim was time barred and the sisters were otherwise estopped from seeking the requested relief. The estates also argued that the sisters could not seek both damages and rescission. In turn, the sisters argued that because of the confidential relationship between the brothers and Mildred, the brothers bore the burden of proving there was no undue influence. They also argued that the time bar and estoppel arguments failed because they were not aware of the basis of their claims until after Mildred died.

¶11 The motion for summary judgment was argued before the Honorable F. James Gavin on June 8, 2010. Judge Gavin denied the motion with respect to the damage claims, deciding that there were material questions of fact about what and when the sisters knew about the agreements. The court agreed that Teresa and Mary Ann could not seek damages and also ask for rescission; it ordered them to make an election of remedies. The sisters elected to pursue rescission of the 2003 documents and abandoned their creditors' claim for monetary damages.

¶12 On March 15, 2011, the estates filed a second motion for summary judgment on the basis that Teresa and Mary Ann had no ability to pursue a rescission claim since they

were strangers to the agreements they sought to rescind and had not offered to restore the estates. The motion also renewed the arguments that the challenge was time barred and the sisters were estopped. The sisters argued that the motion had already been decided by Judge Gavin and specified several material questions of fact left to be resolved.

¶13 The parties argued the second motion for summary judgment before Judge Pro Tempore Douglas Peters on April 21, 2011. Judge Peters ruled that Teresa and Mary Ann had the right to seek rescission under the TEDRA statute but there was no undue influence, and that the 2003 documents were therefore valid. He granted the motion for summary judgment but denied the estates' request for attorney fees against Teresa and Mary Ann.

¶14 After their motion for reconsideration was denied, Teresa and Mary Ann timely filed an appeal. The estates cross appealed, contending that the trial court erred in refusing to award attorneys fees.

## ANALYSIS

¶15 The appeal presents two arguments, which we will address as a single issue. We will then address the estates' cross appeal claim that they were wrongly denied attorney fees.

### Direct Appeal

¶16 The sisters argue that Judge Peters did not have the authority to again consider the summary judgment after Judge Gavin had previously ruled, and that they provided sufficient evidence to proceed to trial on their undue influence claim. We disagree and therefore do not address the estates' claims that the sisters could not rescind an agreement to which they were not parties, the action was untimely, and the sisters had not offered to return the estate to its original position.

¶17 This court reviews rulings on summary judgment in accordance with long-settled standards. We review a summary judgment de novo; our inquiry is the same as the trial court. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). The facts, and all reasonable inferences to be drawn from them, are viewed in the light most favorable to the nonmoving party. *Id.* If there is no genuine issue of material fact, summary judgment will be granted if the moving party is entitled to judgment as a matter of law. *Id.*; *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 93, 993 P.2d 259 (2000).

¶18 These general principles of summary judgment review are supplemented in this context by two other principles. Where, as here, a party is required to establish its case by "clear, cogent, and convincing evidence," this court recently noted:

> When a challenged factual finding is required to be proved at trial by clear, cogent, and convincing evidence, we incorporate that standard of proof in conducting substantial evidence review. A party claiming undue influence must prove it by clear, cogent, and convincing evidence. *In re Estate of Eubank*, 50 Wn. App. 611, 619, 749 P.2d 691 (1988). When such a finding is appealed, the question to be resolved is not merely whether there is substantial evidence to support it but whether there is substantial evidence in light of the "highly probable" test. *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973); *Reilly*, 78 Wn.2d at 640, (recognizing that "[e]vidence which is 'substantial' to support a preponderance may not be sufficient to support the clear, cogent, and convincing" standard). We still view the evidence and all reasonable inferences in the light most favorable to the prevailing party, *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008) and, as in all matters, defer to the trier of fact on issues of credibility. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010).

*In re Trust & Estate of Melter*, 167 Wn. App. 285, 301, 273 P.3d 991 (2012).

■ ¶19 Second, TEDRA is a "grant of plenary powers to the trial court." *In re Irrevocable Trust of McKean*, 144 Wn. App. 333, 343, 183 P.3d 317 (2008). The trial court's TEDRA authority derives from RCW 11.96A.020(1) and (2), which provide:

(1) It is the intent of the legislature that the courts shall have full and ample power and authority under this title to administer and settle:

(a) All matters concerning the estates and assets of incapacitated, missing, and deceased persons, including matters involving nonprobate assets and powers of attorney, in accordance with this title; and

(b) All trusts and trust matters.

(2) If this title should in any case or under any circumstance be inapplicable, insufficient, or doubtful with reference to the administration and settlement of the matters listed in subsection (1) of this section, *the court nevertheless has full power and authority to proceed with such administration and settlement in any manner and way that to the court seems right and proper, all to the end that the matters be expeditiously administered and settled by the court.*

(Emphasis added.)

¶20 The legislature confirmed those powers in RCW 11.96A.060:

The court may make, issue, and cause to be filed or served, any and all manner and kinds of orders, judgments, citations, notices, summons, and other writs and processes that might be considered proper or necessary in the exercise of the jurisdiction or powers given or intended to be given by this title.

¶21 With these general principles in mind, we now turn to the sisters' two arguments challenging the summary judgment ruling.

■ ¶22 *Previous Decision.* The sisters argue that the doctrines of stare decisis, law of the case, and res judicata prohibited Judge Peters from again considering summary judgment after Judge Gavin had previously denied it. The

primary problem with these arguments is that the denial of a summary judgment is not a final order and has no preclusive effect on further proceedings. An order denying summary judgment is essentially interlocutory. It does not end proceedings, but rather permits them to proceed. The denial of a summary judgment motion is not a final order that can be appealed. *Zimny v. Lovric*, 59 Wn. App. 737, 739, 801 P.2d 259 (1990); *Roth v. Bell*, 24 Wn. App. 92, 104, 600 P.2d 602 (1979). Only final judgments are appealable. *See* RAP 2.2(a). A ruling that is not appealable is not a final judgment. *Zimny*, 59 Wn. App. at 739.

¶23 These basic principles resolve the arguments concerning the impact of Judge Gavin's ruling. The doctrine of res judicata has no application because a ruling that is not a final judgment[3] has "no res judicata effect." *Id.* Similarly, in the absence of a final judgment, the other doctrines also have no effect. Stare decisis is not applicable to a trial court decision because "the findings of fact and conclusions of law of a superior court are not legal authority and have no precedential value." *Bauman v. Turpen*, 139 Wn. App. 78, 87, 160 P.3d 1050 (2007). Except in the case of jury instructions, the law of the case doctrine requires a prior appellate court decision in the same case. *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 113, 829 P.2d 746 (1992).[4] It does not apply to identical issues raised repeatedly before the trial court. *MGIC Fin. Corp. v. H.A. Briggs Co.*, 24 Wn. App. 1, 8, 600 P.2d 573 (1979).[5] Since Judge Gavin's ruling did not constitute a final judgment or a

---

[3] The *granting* of a summary judgment motion does result in a final judgment that can have res judicata effect. *In re Estate of Black*, 153 Wn.2d 152, 170-71, 102 P.3d 796 (2004).

[4] The law of the case is a discretionary doctrine. *Folsom v. Spokane County*, 111 Wn.2d 256, 263-64, 759 P.2d 1196 (1988).

[5] Where the trial court varies its instructions from its earlier summary judgment ruling, the focus on appeal must be on the validity of the trial court order rather than the summary judgment order because a judge can "reverse or modify a pretrial ruling at any time prior to the entry of [the] final judgment." *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 37, 864 P.2d 921 (1993) (jury instruction conflicting with prior summary judgment ruling).

ruling of an appellate court, none of the cited doctrines prevented Judge Peters from ruling on the issues presented by the second summary judgment. Were it otherwise, a trial judge would have no authority to reconsider a prior ruling or correct a prior mistake, but would have to memorialize the original ruling in a judgment in order for an appellate court to correct the problem.

¶24 Judge Peters was not foreclosed by Judge Gavin's earlier ruling. Thus, we turn to the primary issue presented—was summary judgment properly granted on the basis that there was no undue influence?

¶25 *Evidentiary Sufficiency.* Undue influence involves unfair persuasion that seriously impairs the free and competent exercise of judgment. *In re Infant Child Perry*, 31 Wn. App. 268, 272-73, 641 P.2d 178 (1982) (citing RESTATEMENT (SECOND) OF CONTRACTS § 177 cmt. b at 491 (1981)). A party claiming undue influence must prove it by clear, cogent, and convincing evidence. *In re Estate of Eubank*, 50 Wn. App. 611, 619, 749 P.2d 691 (1988). The existence of a confidential relationship may give rise to a rebuttable presumption of undue influence. *In re Estate of Haviland*, 162 Wn. App. 548, 558, 255 P.3d 854 (2011). A confidential relationship exists when one person has gained the confidence of the other and purports to act or advise with the other person's interest in mind. *McCutcheon v. Brownfield*, 2 Wn. App. 348, 357, 467 P.2d 868 (1970).

¶26 These principles reflect that fact that Washington applies section 177 of *Restatement (Second) of Contracts* to claims of undue influence in the context of contract formation. It provides:

> (1) Undue influence is unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare.
>
> (2) If a party's manifestation of assent is induced by undue influence by the other party, the contract is voidable by the victim.

(3) If a party's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the undue influence either gives value or relies materially on the transaction.

Comment:

. . . .

*b. Unfair persuasion.* . . . The degree of persuasion that is unfair depends on a variety of circumstances. The ultimate question is whether the result was produced by means that seriously impaired the free and competent exercise of judgment. Such factors as the unfairness of the resulting bargain, the unavailability of independent advice, and the susceptibility of the person persuaded are circumstances to be taken into account in determining whether there was unfair persuasion, but they are not in themselves controlling.

¶27 Whether or not the *Restatement* was cited, Washington courts long have consistently applied these principles in contract, will, and gift situations involving allegations of undue influence. *E.g.*, *Gerimonte v. Case*, 42 Wn. App. 611, 712 P.2d 876 (1986) (contract);[6] *Ferguson v. Jeanes*, 27 Wn. App. 558, 619 P.2d 369 (1980) (contract); *Haviland*, 162 Wn. App. 548 (will changing bequests); *Dean v. Jordan*, 194 Wash. 661, 79 P.2d 331 (1938) (same); *McCutcheon*, 2 Wn. App. 348 (gift); *Endicott v. Saul*, 142 Wn. App. 899, 176 P.3d 560 (2008) (guardianship action involving gift resulting from sale below market value).

¶28 The sisters argue that because their mother was distraught by the death of her husband and because she was dependent upon the brothers to run the farming operation, there was a confidential relationship between them.[7] Thus, the sisters argue that a presumption of undue

---

[6] Prior to the adoption of *Restatement (Second) of Contracts*, Washington relied upon the original *Restatement of Contracts*, section 497 (1932), from which the current section 177 was derived. *See Gerimonte*, 42 Wn. App. at 614-15.

[7] For purposes of summary judgment, we agree that sufficient evidence was produced to permit the trier-of-fact to find a confidential relationship at trial,

608

influence existed and it was incumbent upon the brothers to show otherwise at trial. This argument is insufficient for three reasons.

¶29 First, the argument fails because Mildred made a fair bargain with her sons. The sisters argue that the gift of the HLJ stock was the result of undue influence by the brothers. That argument ignores the entirety of the transaction as well as the situation Mildred was in at the time she entered into the 2003 transactions. As a result of the FSA financing and the Farming Agreement, both entered into shortly before Harvey Jones died, the land was pledged as collateral and all proceeds from the farming operations went to HLJ in order to retire the debt. When Harvey died, Mildred was left with encumbered farmland that was committed to debt retirement rather than income. In order to obtain income, she would have to sell the property. However, with the land tied up by the loan, there was little (if any) equity and essentially no market value due to the commitments. The brothers, who shared the same financial commitments, were the only ones who could possibly be interested in purchasing the land.

¶30 The lease/purchase agreement provided Mildred with income to live on while permitting her to hire a caregiver and stay in the family home as she desired. The "gift" of the stock, which was necessary if the brothers were to take on Mildred and Harvey's debt that was secured by the land, made the brothers the owners and gave them managerial control that would be necessary to obtain future financing. The brothers were the only ones who could buy the land and provide for their mother's support. In addition to receiving the support payments, Mildred's debt was wiped out. This arrangement was fair to both sides.

¶31 An unfair or disparate transaction is not a required element of a claim of undue influence but is only one factor courts consider in determining whether there was actual

although it is a close call. *See Lewis v. Estate of Lewis*, 45 Wn. App. 387, 725 P.2d 644 (1986) (similar evidence of influence found insufficient).

undue influence. *See* RESTATEMENT (SECOND) OF CONTRACTS § 177 cmt. b. Typically, however, it is the primary reason that claims of undue influence are litigated. Without an "unfair" transaction, there seldom is any reason to seek recovery of an asset or any basis for a damage award. If, for instance, the brothers had used their confidential relationship to convince Mildred to sell them the land for $1,000,000 per acre, a claim of undue influence could still be brought, but it is highly unlikely there would be any damages.

¶32 The transactions at issue here, viewed in their entirety, do not show an unbalanced deal. Mildred got out from substantial debt and was allowed to stay in her own home while receiving payments that she could not have received otherwise. While the evidence may have established a confidential relationship, it did not establish undue influence. The sisters complain that the brothers got more of the *estate* than they were entitled to receive. Br. of Appellants at 18. That is incorrect. The brothers ended up with more of the *farm* than they would have received if the 2003 agreements had not occurred, but all of the children received the same ¼ share of the estate. Nothing in the wills required the parents to leave the farm to the children; they could have sold it at any time. The estate was not required to be in any particular form.

¶33 An undue influence claim must include more than merely the presumption that can arise from a confidential relationship. In cases where a confidential relationship resulted in undue influence, there typically is evidence of some type of loss resulting from that relationship. *E.g.*, *Haviland*, 162 Wn. App. 548 (confidential relationship led to changes in bequests); *Endicott*, 142 Wn. App. 899 (confidential relationship led to sales at below market value); *Ferguson*, 27 Wn. App. 558 (confidential relationship resulting in unwanted and equal partnership despite unequal contributions); *McCutcheon*, 2 Wn. App. 348 (relationship

resulting in property deed).[8] In other words, there must be something more than the relationship. Here, there was not. A focus on simply what was given up, without consideration of what was received, is not sufficient to establish that an unfair transaction occurred. In the absence of an unbalanced transaction, there has to be some additional evidence of influence beyond the confidential relationship. Here, there was none.

¶34 Second, the argument fails because the brothers did come forward with evidence rebutting the presumption. While summary judgment may be granted on the basis of a presumption, the presumption also may be defeated by evidence. *Tiger Oil Corp. v. Yakima County*, 158 Wn. App. 553, 562, 242 P.3d 936 (2010).

¶35 The brothers presented evidence that Mildred was competent and capable of making her own decisions.[9] Her certified public accountant filed an affidavit detailing his discussions with her over corporate tax and valuations matters in 2003-2005; he had no questions about her competency. The notary public who notarized the signatures on the 2003 documents declared that Mildred had acted freely and voluntarily. The notary public also indicated that she would not have notarized the documents if she had any concerns about Mildred's ability to sign. The financial consultant who developed the 2003 plan declared that he did so to aid Mildred and he explained the concept to her. He had no concerns about her mental competency, and he saw no signs of inappropriate influence being exerted by Dennis and Will. Mildred's caregiver likewise agreed that Mildred was mentally competent in 2003 when the documents were signed.

---

[8] In addition to the confidential relationship, the *McCutcheon* court focused on five additional factors relating to the victim's impaired condition, prior dealings between the two parties, and the deed preparation process. 2 Wn. App. at 358.

[9] For instance, Teresa used to write checks for her parents. Shortly after her father's death, she returned the checkbook to Mildred, who issued her own checks for the next four years.

¶36 Neither the sisters nor anyone else ever produced evidence suggesting that Mildred was incompetent or incapable of handling her own affairs. The only evidence was to the contrary. Presumptions must give way in light of evidence. *In re Marriage of Akon*, 160 Wn. App. 48, 62, 248 P.3d 94 (2011).[10] For this reason, too, the trial court correctly concluded that the evidence did not support the claim.

¶37 Third, the argument fails in light of the trial court's broad powers under TEDRA and the heightened burden the sisters had to meet. As previously noted, the sisters had to establish undue influence by clear, cogent, and convincing evidence. *Melter*, 167 Wn. App. at 301; *Eubank*, 50 Wn. App. at 619. The trial judge's plenary power to settle the estate expeditiously permitted Judge Peters, even if he believed there had been enough evidence to proceed to trial, to resolve the matter by weighing the evidence in light of the heightened burden of proof. In other words, even if the presumption of undue influence existed, the judge was permitted under TEDRA to weigh that presumption against the noted evidence of competency and no undue influence and summarily decide the case without setting the matter to the trial docket.

¶38 The Harvey Jones estate had been pending for seven years, and Mildred's estate nearly four years, by the time Judge Peters heard the motion. The sisters had presented no evidence of incompetency or undue influence but were content to rest on their evidence that a special relationship existed between their mother and their brothers. TEDRA permitted Judge Peters to resolve the case rather than let it linger. For this reason, too, we believe the judge was empowered to resolve the case on the evidence presented.

---

[10] "A presumption is not evidence and its efficacy is lost when the other party adduces credible evidence to the contrary." *In re Indian Trail Trunk Sewer Sys.*, 35 Wn. App. 840, 843, 670 P.2d 675 (1983).

¶39 The trial court correctly determined there was insufficient evidence of undue influence to proceed to trial. The decision to grant summary judgment is affirmed.

*Cross Appeal*

¶40 The estates challenge the trial court's decision to deny attorney fees. Both sides seek attorney fees for this appeal. The trial court did not abuse its considerable discretion when it denied fees. In light of the fact that there is no prevailing party in this appeal, we likewise decline to award fees.

¶41 The decision to award attorney fees in a TEDRA action is discretionary with the trial court. RCW 11.96A-.150(1). The trial court can consider any factors it deems relevant when awarding fees, including whether or not the litigation benefitted the estate. *Id.*

¶42 The decision to deny attorney fees to the estates was reasonable. The sisters were litigating with the hope of increasing the estate, so defeating that lawsuit did not benefit the estate. In light of what looked to be self-dealing, the actions of the sisters were understandable, if perhaps overly prolonged. Although the estates were forced to defend, they were not blameless in the instigation of the action. The trial court had a tenable basis for denying attorney fees. There was no abuse of discretion.

¶43 This court likewise has discretion to award attorney fees on appeal. *Id.* Both parties prevailed on the issues in which they were respondents, and both parties failed to prevail on the issues where they were appellants. We accordingly decline to award attorney fees to either side. The appeal and cross appeal presented debatable issues, and we do not believe either side acted in bad faith in

pursuing this appeal. As a result, there is no prevailing party and attorney fees will not be awarded.

¶44 The judgment of the trial court is affirmed.

SWEENEY and BROWN, JJ., concur.