# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ALLIANT CREDIT UNION, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | No. 76669-4-I |
| | ) | |
| v. | ) | |
| | ) | |
| IMELDA ABREGO, individually, and | ) | UNPUBLISHED OPINION |
| the marital community composed of | ) | |
| IMELDA ABREGO and JOHN DOE | ) | |
| ABREGO, husband and wife, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 31, 2018 |
| | ) | |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 DEC 31 AM 9: 44
FILED

DWYER, J. — Imelda Abrego obtained a loan from Alliant Credit Union on which she subsequently defaulted. Alliant sued Abrego for breach of contract and was granted summary judgment. On appeal, Abrego asserts that a factual dispute existed as to whether she personally applied for and obtained the loan and that the trial court improperly dismissed her counterclaims against Alliant and its attorneys for abuse of process. Finding no error, we affirm.

I

Alliant Credit Union received a vehicle loan application from Imelda Abrego on October 31, 2014. The loan application related to Abrego's request for the financed acquisition of a 2014 Mercedes GL 450. The application inputs included Abrego's name, e-mail, income, employer, and a VIN for the Mercedes.

On November 3, Abrego sent Alliant a copy of the purchase agreement for the Mercedes and earnings statements for two periods in October 2014. The purchase agreement showed the total purchase price of the Mercedes to be $74,419, with $9,419 to be paid directly by Abrego to the dealership and $65,000 to be financed by Alliant. This purchase agreement listed Abrego's home address, date of birth, driver's license number, and home telephone number.

The next day, Alliant's loan officer, Lukas Gagainis, telephoned Abrego at her landline number and had a conversation with Abrego that was recorded by Alliant. Abrego verified a number of personal identifier questions during the call. Gagainis informed Abrego that she would need to become an Alliant member to proceed with her loan application. Gagainis also advised Abrego that he would be out of the office the following day, November 5, and gave Abrego the name and telephone number of his supervisor, Andy Vostatek, so that she could telephone him to close on the loan details once she was approved for membership.

On November 5, Abrego submitted a membership application to Alliant to facilitate approval of her loan application and, that same day, telephoned Vostatek from her landline. During the call, she verified her Social Security number, date of birth, and ZIP code. Vostatek advised Abrego that she could expect an e-mail from Alliant's loan processing department that would subject her to a security verification process. During that call, Abrego confirmed that the $65,000 loan advance check

would be made jointly payable to her and to the Mercedes dealership and sent via Federal Express to her home address in Seattle. She also confirmed that monthly loan payments would be due on the 20th of each month.

After this telephone call took place, another Alliant employee prepared the loan documents and e-mailed them to Abrego via Docu-Sign, a company that provides authentication services to facilitate the electronic execution of contracts. Pursuant to Docu-Sign's authentication process, Abrego was required to correctly answer 18 security questions to access the loan documents and electronically sign them. The authentication questions were highly specific to Abrego, asking for information that included several prior street addresses, past vehicles owned or leased, and information about Abrego's relatives. Docu-Sign's certificate of completion shows that Abrego authenticated this security protocol and electronically signed the loan documents. The loan documents electronically signed by Abrego included a loan and security agreement, vehicle title requirement instructions, a notice to provide physical damage insurance, and authorization for Automated Clearing House automated payments on the loan. To authorize these automated payments, Abrego identified her personal Bank of America account from which monthly payments of $973.84 were to be withdrawn.

Following Abrego's execution of these loan documents, Alliant purchased a $65,000 check from Moneygram Payment Systems, which

was made jointly payable to Imelda Abrego and to Lauderdale Luxury Automotive. On November 6, Alliant sent this check to Abrego's address via Federal Express's overnight shipping option. Abrego admits receiving this check. But she did not send it on to the dealership. Instead, she overnighted the check to Deon Glover in Miami, Florida. Abrego later claimed that she did this in lieu of taking a planned trip to Florida to buy the Mercedes.

Abrego made her first $973.84 monthly payment on the loan on December 20, 2014, and continued making monthly payments until her failure to make the May 20, 2015 payment placed her in default.

During this time, however, Abrego did not provide Alliant with a vehicle title or with proof of insurance as the terms of the loan required. On February 4 and again on March 6, Alliant sent letters to Abrego reminding her of her obligation to provide it with the original title. Also in March, an Alliant employee called Abrego to remind her of the title obligation and to inform her that her monthly payments would increase due to Abrego's failure to provide proof of insurance on the Mercedes. Abrego then obtained insurance on the Mercedes and provided Alliant with proof of this insurance, resulting in her monthly payments remaining at $973.84.

However, Abrego still did not provide Alliant with a vehicle title. On April 7, an Alliant representative telephoned Abrego to speak with her regarding the title. Abrego stated, in response, that she had forgotten to

call the dealership about the title and that she would do so the same day. A follow-up call from Alliant on April 23 met with similar results—Abrego assuring the Alliant representative that she would contact the dealership.

Then, on May 5, Abrego, for the first time, affirmatively stated that she did not have the title to the vehicle and that she had "co-signed for friend." Following her default later that month, Abrego telephoned Alliant's fraud unit to state that the Mercedes was not in her possession, and that she "was part of a business where the vehicle was to be used for business purposes," but that she was scammed and the vehicle did not exist. Following several months during which the loan remained in default, Alliant filed suit against Abrego in the King County Superior Court.

Not long before the trial court was to enter a default judgment against her, Abrego filed a bankruptcy petition, causing Alliant's litigation to be stayed. In her bankruptcy schedules, Abrego identified the Mercedes as a personal asset and the loan from Alliant as an undisputed personal debt. Alliant's counsel subsequently issued a bankruptcy subpoena and, on February 4, 2016, deposed Abrego. In this deposition, Abrego made several admissions regarding the loan.

Abrego testified that the loan was part of a scheme entered into with two Florida men who led her to believe that they would start a business with her and that each of the three would contribute $130,000 in seed money. She further testified that she financed her $130,000 contribution through the $65,000 loan from Alliant and another $65,000

loan from SunTrust Bank, and that she delegated the task of completing the loan applications to the two men. Finally, she admitted that she understood that the loans were to be taken out in her name before being assumed by the business.

Abrego also provided documents responsive to Alliant's subpoena, including a police report intake form for the North Miami Police Department in which she stated that she "obtained" the loan from Alliant. Abrego also produced several e-mails that she had sent to the Florida men acknowledging that the debt was in her name and seeking further cooperation to have the business assume the debt.[1]

Following Abrego's deposition, both Alliant and the bankruptcy trustee filed independent nondischargeability complaints against Abrego in the bankruptcy court premised upon fraud and related allegations. Ultimately, Abrego stipulated to a waiver of discharge, which was approved by the bankruptcy court's order of June 24, 2016. This order stated that "any and all claims, debts, and liabilities of [Abrego] arising before November 25, 2015 . . . are not discharged and are hereby deemed nondischargeable to the fullest extent of the law."

Until this point, Abrego had been represented by an attorney. Following the dismissal of her bankruptcy petition and the lifting of the automatic stay on Alliant's litigation, Abrego, now pro se, filed an answer, counterclaims against Alliant, and cross claims against its attorneys,

---

[1] The business was incorporated in Florida as SMGZ Group LLC.

Turnbull & Born, PLLC, and Brian M. Born, individually.[2] The trial court granted Alliant's motion for summary judgment, awarding Alliant judgment in the amount of $65,005.64 plus costs in the amount of $818.89. The court denied Abrego's cross motion for summary judgment and dismissed her counterclaims and third party claims. Subsequently, the trial court entered its findings of fact and conclusions of law and an amended judgment awarding Alliant $21,700 in attorney fees. Abrego appeals.

II

Abrego first contends that summary judgment was improperly granted to Alliant on its breach of contract claim. This is so, she avers, because an issue of material fact existed as to whether she personally applied for and obtained the loan in question, and because Alliant was not entitled to judgment as a matter of law. We disagree.

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). We review an order of summary judgment de novo, performing the same inquiry as does the trial court. Mohr v. Grant, 153 Wn.2d 812, 821, 108 P.3d 768 (2005). The facts and all reasonable inferences drawn therefrom are construed in the light most favorable to the nonmoving party. In re the Estates of Jones, 170 Wn. App. 594, 603, 287 P.3d 610 (2012). Once a motion for summary judgment has been brought, however, the opposing party must produce specific evidence, either through affidavits or

---

[2] Abrego alleged that Alliant and its attorneys committed the tort of abuse of process.

admissible evidence, demonstrating that a factual dispute exists or that the moving party, under the law, is not entitled to judgment. CR 56(e).

In considering whether a nonmoving party has shown the existence of a factual dispute, Washington courts employ the "sham affidavit" rule. Taylor v. Bell, 185 Wn. App. 270, 294, 340 P.3d 951 (2014). Under this rule, when a party has earlier rendered clear answers to unambiguous deposition questions that negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue by providing an affidavit that merely contradicts, without explanation, previously given clear testimony. Bell, 185 Wn. App. at 294; Marshall v. AC&S, Inc., 56 Wn. App. 181, 185, 782 P.2d 1107 (1989). The rule is a narrow one, as the self-serving affidavit must "directly contradict[]" the affiant's previous "unambiguous sworn testimony." Kaplan v. Nw. Mut. Life Ins. Co., 100 Wn. App. 571, 576, 990 P.2d 991 (2000). If the subsequent affidavit offers an explanation for the variance from the previously given testimony, the trier of fact should determine the explanation's plausibility and summary judgment should thus be denied. Safeco Ins. Co. of Am. v. McGrath, 63 Wn. App. 170, 175, 817 P.2d 861 (1991).

Alliant avers that the sham affidavit rule applies to Abrego's contention that she never applied for the $65,000 loan nor authorized others to do so in her name. Alliant points to several statements in the record that contradict this assertion and would, thus, negate any issue of material fact. Among these is Abrego's statement given to North Miami police, dated November 23, 2015 (shortly before the commencement of bankruptcy proceedings), that she

"obtained a loan for the business in the amount of $65,000.00 from Alliant Credit Union." This statement is accompanied by a written declaration:

> I, [Imelda Abrego], certify under oath and under penalty of perjury that the below statement is true and correct. I further certify that the below statement is made by me freely and voluntarily and without threat or promise of any kind.

Under Florida law, this declaration allows the police report to be considered a verified document equivalent to a sworn affidavit.[3] Thus, Abrego's statement that she "obtained a loan" is an unambiguous sworn statement that directly contradicts her later testimony. Furthermore, Abrego does not offer any explanation for the inconsistency between this statement and her current averment. Abrego has thus failed to demonstrate that a genuine dispute of material fact exists.

Alliant is also entitled to judgment as a matter of law on its claim for breach of contract. Alliant has proved all of the elements required for a successful breach of contract claim: the parties formed a valid contract, Alliant performed its obligations pursuant to the contract (providing a check for the full amount of the loan), Abrego breached this contract when she defaulted, and Alliant has suffered and continues to suffer damages as a result of Abrego's default.

Abrego's assertion that a contract was not formed is belied by Abrego's admission otherwise, discussed above. Alliant performed on the contract by providing the loan funding and Abrego breached the contract by defaulting.

---

[3] FLA. STAT. § 92.525.

Abrego claims that Alliant did not actually suffer damages, citing a Florida department of motor vehicles record for the Mercedes that she never purchased, which states that there is no lien on the vehicle. Abrego would have us infer that the vehicle was purchased with Alliant's loan funds but that an unknown third party then paid off the loan. In fact, Abrego never purchased the vehicle, nor did she provide Alliant with the title thereto, nor did Alliant receive payment on the loan after Abrego defaulted. Indeed, that there is no lien is unsurprising given that Abrego never purchased the vehicle.

In her cross motion for summary judgment, Abrego presented several defenses to contract formation, none of which are availing.[4]

Abrego's primary argument appears to be that she should be relieved of her obligations because she is the victim of a scam. However, the actions of third parties do not affect Abrego's liability under the agreement. Abrego admitted obtaining the loan. Whether she applied for the loan herself or delegated this task to others, no party could have accessed the loan documents without the extensive personal information needed to clear the online security protocol. Abrego confirmed the details of the loan in a recorded telephone call and subsequently received the check. Once Alliant funded the loan pursuant to the agreement and delivered the check to Abrego, Abrego's obligation was fixed.

Abrego chose to overnight the check to Deon Glover and not to present it to the dealership, in violation of the terms of the loan. Moreover, she did not

---

[4] On appeal, Abrego raises additional defenses that, pursuant to RAP 9.12, will not be considered as they were not raised in the trial court.

disclose to Alliant that the vehicle was supposedly being purchased for a "business" or that she would rely on her "business partners" to pay off the debt. Instead, she made loan payments for five months and, in a further effort to keep the ruse alive, even took out an insurance policy on a vehicle that she had never purchased. She also assured Alliant that she would be able to produce the title to the vehicle despite having had no contact with the dealership. Abrego's claimed subjective expectation, undisclosed to Alliant until after her default, that third parties would pay off the loan is wholly immaterial to the question of her liability.

Abrego also asserts that she should not be liable for the debt on the theory that Alliant should not have disbursed funds from a check that lacked the dealership's endorsement. This assertion ignores the fact that Alliant, as the purchaser and drawer of the check, had no connection to the clearinghouse transaction pursuant to which the funds were disbursed. Thus, Alliant had neither the ability nor the right to honor or dishonor the check. As both parties acknowledge, the check was issued not by Alliant but by Moneygram Payment Systems. Alliant wired funds to Moneygram to purchase the check; subsequent to the purchase, the check's funds would be drawn on the account of Moneygram, not Alliant.

Alliant sent this check to Abrego pursuant to the loan agreement with instructions to endorse the check and deliver it to the auto dealer, which Abrego also admits she did not do, as she instead overnighted the check to Deon Glover. Once Glover was in possession of the check, he needed only to convince a bank

to accept it and pay out the funds. The branch bank at which the check was cashed honored the check despite the missing endorsement and participated in a clearinghouse transaction with Moneygram to receive and disburse the funds. Alliant was not a party to this transaction; thus, Abrego's contention fails.

Abrego also alleged other facts on her cross motion to the effect that Alliant was "negligent." While negligence is not a defense in actions on a contract, Abrego alleges that her signature on the loan agreement was forged, that the earnings statements provided to secure the loan were fraudulent, that Alliant did not close her bank account after she requested that it do so, and that Alliant was informed that Abrego was the victim of a scam.

Abrego's claim that her signature was forged ignores the fact that she executed the loan agreement using Docu-Sign, a software program that produces an electronic signature. Electronic signatures are given the same legal status as handwritten signatures pursuant to the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001-7006. Pursuant to Docu-Sign's processes, the loan documents were e-mailed to Abrego in an encrypted format that could be accessed only after successfully answering an extensive security questionnaire, which Abrego completed. The signature is applied by clicking a "Confirm Signing" button.[5] The electronic execution of this agreement, whether completed by Abrego personally or by her "business partners" using information only Abrego could have provided, does not alter its enforceability.

---

[5] DocuSign, "How Does DocuSign Work?" https://www.docusign.com/products/electronic-signature/how-docusign-works (last visited Nov. 29, 2018).

Abrego claims to have never received an earnings statement from her employer, and at her deposition stated that she had not seen the earnings statements in Alliant's possession because she was paid electronically. In the transcript of Abrego's telephone call with Alliant on November 4, 2014, however, she acknowledges providing Alliant with proof of income. Alliant had no reason to doubt the veracity of the earnings statements, which were consistent with Abrego's representations in her loan application.

Finally, neither Alliant's refusal to close Abrego's account when Abrego had defaulted on an outstanding debt nor Abrego's belated disclosure of the claimed scam to Alliant alter the fact that Alliant performed its obligations on the contract while Abrego failed to do so.

Abrego points to other irregularities in the loan application documents, none of which are material in light of her admissions and none of which alter the fact that the parties formed a contract. All of Abrego's assertions concerning "negligence" or a failure to exercise due diligence amount to nothing more than a claim that Alliant should have protected Abrego from her own wrongful behavior.

Abrego's defenses to the formation of a valid contract and against the existence of a breach all fail. Alliant was entitled to judgment on its breach of contract claim as a matter of law. The trial court was correct to grant Alliant's motion for summary judgment.

III

Abrego also appeals from the trial court's dismissal of her abuse of process claims against Alliant and its attorney of record, Brian M. Born. The

dismissal was made in error, she asserts, because Alliant, by and through its attorney, pursued its breach of contract claim despite Abrego's denials that she applied for or obtained the loan. We affirm the dismissal. Abrego's submissions do not satisfy any of the elements of an abuse of process claim either against Alliant or against its attorney.[6]

Abuse of process is defined as the use of "a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." 16A DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 22:10, at 236 (4th ed. 2013). The essential elements in an action for abuse of process are:

> (1) The existence of an ulterior purpose—to accomplish an objective not within the proper scope of the process;
> (2) An act in the use of legal process not proper in the regular prosecution of the proceedings;
> (3) Harm caused by the abuse of process.

Bellevue Farm Owners Ass'n v. Stevens, 198 Wn. App. 464, 466, 394 P.3d 1018, review denied, 413 P.3d 565 (2017). Only in Abrego's reply brief on appeal does she allege an ulterior motive: that Alliant sought to collect double payment on the loan, to avoid responsibility for its own mistake (essentially, in granting her the

---

[6] In the trial court, Abrego styled her counterclaims as "Harassment, Bad Faith Actions, and Discrimination from Counterclaim Defendants." On appeal, she characterizes the claim as one for abuse of process. We analyze the claim in accord with Abrego's desired characterization.
Alliant interpreted this counterclaim as alleging malicious prosecution and has defended it accordingly. A party alleging malicious prosecution must show that the underlying action (1) was instituted with knowledge that the same was false, (2) is unfounded, (3) was initiated with malice, (4) was filed without probable cause or was filed as part of a conspiracy to abuse judicial process by filing an action known to be false or unfounded, (5) led to the arrest or seizure of property, and (6) caused special injury that would not necessarily result from similar causes of action. RCW 4.24.350(1); Clark v. Baines, 150 Wn.2d 905, 912, 84 P.3d 245 (2004). Because there is no basis to conclude that Alliant knowingly instituted the underlying action based on false and malicious pretenses, Abrego's counterclaim also fails under a malicious prosecution analysis.

loan), and "to intimidate, harass, bully, humiliate, embarrass, slander, disparage, and discriminate against Abrego to injure and tie up her resources to coerce her into submission."

There is no basis to conclude that Alliant is seeking "double payment" on the loan because the loan was never paid off in the first place. There is also no basis to conclude that Alliant is seeking to "avoid responsibility" for a past misdeed; the entire point of suing for breach of contract is to prevent the party in breach from avoiding its responsibility when the other party has performed. Further, Abrego does not demonstrate that Alliant's actions constitute an effort to intimidate her into submission rather than simply carry out the present litigation. None of the documents to which Abrego cites supports an inference to the contrary.

As Abrego has not shown the existence of any ulterior purpose for Alliant's actions, we need not reach the second and third elements of an abuse of process claim. The trial court did not err in dismissing Abrego's counterclaim against Alliant.

Abrego's third party claims against Alliant's attorney, Brian M. Born, in his personal capacity, and against his firm, Turnbull & Born, PLLC, allege nothing other than the same facts discussed above, and are further precluded by the applicable statute governing abuse of process claims, RCW 4.24.350. Specifically, subsection (3) of this statute provides that "[n]o action may be brought against an attorney under this section solely because of that attorney's representation of a party in a lawsuit." As Abrego's claims against Born and

against Turnbull & Born, PLLC are wholly indistinct from her claim against Alliant, they plainly were made solely on the basis of the Born's representation of Alliant. They thus fail as a matter of law. The trial court did not err in dismissing these third party counterclaims.

IV

Alliant is entitled to an award of reasonable attorney fees on appeal pursuant to its contract with Abrego. The parties' loan agreement states that Abrego will pay "all costs of collecting what you owe under this Agreement, . . . including court costs, . . . and reasonable attorney fees. . . . This provision also applies to . . . appeals." The trial court correctly awarded attorney fees to Alliant. We do the same. Upon compliance with the applicable rule, a commissioner of our court will enter a suitable order.

Affirmed.

We concur: