FILED
COURT OF APPEALS
DIVISION II

2015 AUG 25 AM 8: 45

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

In re the Estate of:

CHARLES ROBERT THORNTON,

                Deceased.

No. 46337-7-II

UNPUBLISHED OPINION

MELNICK, J. — Martin Thornton appeals from the trial court's summary judgment dismissal of his Trust and Estate Dispute Resolution Act (TEDRA) petition which sought to invalidate Charles (Bob) Thornton's 2010 will for undue influence and fraud in the inducement and to establish a constructive trust over distributed nonprobate assets.[1] Because no material factual dispute exists on any claim, we affirm the trial court. We also affirm the trial court's attorney fees award, but we decline to award fees to either party on appeal.

## FACTS

Merry Heberlein and Bob were in a committed loving relationship beginning in March 2003 and ending on December 5, 2010, when Bob passed away at the age of 67. At the time of Bob's death, he and Heberlein lived together and jointly operated a real estate business. They maintained many bank accounts as joint tenants with right of survivorship. They also designated each other as the primary beneficiaries on their respective retirement accounts in 2007 and 2008.

In early October 2010, Bob visited his doctor to inquire about a cough that was getting progressively worse. He also experienced a myriad of health issues including fatigue, afternoon

---

[1] We will use first names throughout this opinion when necessary for clarity; we mean no disrespect.

headaches, and shortness of breath. During the second week of October, Bob's doctors advised him he had a terminal illness. They estimated that he had a 5 percent chance of survival and a life expectancy of 2 to 6 months.

Bob's diagnosis prompted him to reexamine his estate plan and put his affairs in order. Bob enlisted the help of longtime friends. Bob called his friend Sue Holbrook and asked her to recommend an attorney to draft a new will for him. Sue recommended Desiree Hosannah. Bob told Sue that he intended to take care of Heberlein in his new will. Bob also told Paul Henderson, his friend and business associate, that he hired a lawyer to rewrite his will and that he needed to "put his affairs in order." Clerk's Papers (CP) at 79. Bob asked Henderson to witness the execution of the new will.

Bob and Heberlein met with Hosannah on the afternoon of October 18. Heberlein filled out the initial consultation paperwork, which included general information such as Bob and Heberlein's contact information, their purpose for the meeting, and referral information. Both Bob and Heberlein signed the document. The paperwork did not include any substantive information about the proposed terms of Bob's or Heberlein's estate planning documents.

Over the course of the afternoon, Bob and Heberlein had joint and separate meetings with Hosannah. In a private meeting, Bob told Hosannah that, in anticipation of an upcoming medical procedure, he wanted his estate plan in place. He identified Heberlein as his primary beneficiary and his sister, Doris Ellison, as his alternate beneficiary. When Hosannah inquired about his son, Martin, Bob told her that he had "already given him all he is going to get" in the form of a house given some years before and that Martin was a "bad seed."[2] CP at 82. Bob also told Hosannah

---

[2] In 1996, Bob conveyed title to his home to Martin. Martin contends that the conveyance was not a gift, but a purchase.

2

that Martin had a criminal background and had brought drugs to a family function a few years ago; therefore, Bob did not want to leave Martin anything in his estate plan. Bob told Hosannah that he had already taken care of some assets by placing them in joint-ownership with Heberlein and that he wanted the new will to address the remaining assets. According to Hosannah, Heberlein did not instruct her as to the terms of Bob's estate plan in any respect.

Bob and Heberlein executed their wills before leaving Hosannah's office on October 18. As requested, Bob's friend, Henderson, signed Bob's will as a witness. Bob's 2010 will named Heberlein as both the primary beneficiary of his entire estate and his personal representative. It named his sister as his alternate beneficiary and alternative personal representative. Bob's 2010 will revoked his 1988 will, which named Martin as Bob's primary beneficiary.

After executing his new will, Bob continued to discuss his desire to provide for Heberlein. In November, Bob told his longtime friend, Judy Johnson, that he had made a new will naming Heberlein as his beneficiary and that he and Heberlein had consolidated their assets. When Bob called his sister to tell her he had terminal cancer, he told her that he had prepared a new will providing for Heberlein.

Bob and Heberlein registered as domestic partners, effective October 19, 2010. They filled out the registration and had their signatures notarized. Bob then called his friend, Joe Holbrook, and asked if he and Sue could file the domestic partner registration documents in Olympia. Bob also told Joe that he wanted to make sure Heberlein was taken care of given his worsening medical condition. According to Heberlein, she and Bob asked their good friends to file the registration documents because they were busy attending Bob's doctor appointments.

Bob continued to work as a real estate agent. During the month of October, he helped Johnson and her husband sell their home. Bob handled the entire transaction, including the closing

3

on November 22. Bob transitioned his work files to Henderson in anticipation of his cancer treatment scheduled to begin on November 29. Henderson found Bob's files to be well-organized.

On November 29, the hospital admitted Bob so he could start an aggressive treatment for kidney cancer. Bob's condition, worse than expected, resulted in the hospital discontinuing the treatment. On December 2, Bob's sister, a registered nurse, arrived from out-of-state to visit him in the hospital. According to her, Bob was lucid and coherent. He suffered from shortness of breath but could talk normally. He showed no signs of mental problems. On the afternoon of December 4, Bob took a nap and never regained consciousness. He passed away the next day. According to Bob's treating physician, Bob took numerous inpatient medications while hospitalized; however, prior to that time, he did not have prescriptions for any medications that would alter his mental status or judgment.

Martin did not visit Bob at the hospital. According to Heberlein, she contacted Martin and asked him to visit Bob in the hospital, but Martin did not do so. According to Martin's wife and daughters, Heberlein was not forthcoming about Bob's welfare and she blocked Martin and his family from seeing Bob. Longtime friends of Bob and Martin's, Guadalupe and Terry Cuevas, corroborated Martin's version that Heberlein would not allow them or Martin's family to visit Bob in the hospital during his final days.

Bob's 2010 will was admitted to probate, and the court appointed Heberlein the personal representative of the estate. Martin then filed a TEDRA petition to invalidate the 2010 will. He alleged that Bob lacked testamentary capacity to execute the will and that the will was the product of undue influence and fraud in the inducement by Heberlein. Martin also pled a cause of action for constructive trust, claiming that any nonprobate assets distributed to Heberlein should be held in a constructive trust for his benefit.

Heberlein moved for summary judgment in both her individual capacity and as personal representative of Bob's estate. Heberlein filed declarations and exhibits in support of her motions, and Martin presented competing evidence in opposition.

Martin and Heberlein painted different pictures of the quality of Martin and Bob's relationship, Bob's health in his final months, and whether Heberlein isolated Bob from Martin and his family. According to the Cuevases, Bob and Martin had a close, unstrained relationship. According to Martin, he and his father treasured their time together, which historically included five or six family get-togethers a year. Martin's wife and daughters declared that they had always had a close relationship with Bob, but as Bob's relationship with Heberlein progressed, their family spent less time with him.

According to Martin's family, Heberlein reduced the number and duration of family get-togethers and made those few interactions uncomfortable. Martin's wife described Heberlein as "[driving] wedge between [her] family and Bob." CP at 597. As an example, Martin's wife described a time when she and Martin contacted Bob during Thanksgiving 2010 and asked to come visit, but Bob said that "[Heberlein] is locking the doors and no one can come over." CP at 598. Martin also related an occasion in August 2010, where he claimed Heberlein refused to allow him "substantive interaction" with Bob at a family boating outing. CP at 107. Martin averred that on that same occasion, Bob "was so ill he was lost," that he was heavily medicated and coughing terribly, and that he appeared to be in a very vulnerable state. CP at 107. Further, Martin claimed that although he made multiple attempts to speak with Bob during the last months of his life, Heberlein rebuffed him and essentially barred him from speaking with his father. Martin alleged that Heberlein told Bob that Martin only desired a relationship with him for his money.

5

On the other hand, Heberlein declared that Bob and Martin rarely saw each other. According to Bob's sister, Bob had an extremely difficult relationship with Martin, and he told her on more than one occasion that he felt that he had given Martin everything he could possibly give. According to Johnson, Bob repeatedly expressed frustration with Martin. And, Henderson declared that in October 2010 he personally witnessed Bob call Martin and leave messages asking Martin to call him back.

Martin voluntarily dismissed his lack of testamentary capacity claim. The trial court dismissed the remainder of Martin's claims on summary judgment. Martin appeals.

## ANALYSIS

### I.  STANDARD OF REVIEW

We review an order for summary judgment de novo, engaging in the same inquiry as the trial court. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We construe all facts and their reasonable inferences in the light most favorable to the nonmoving party. *Jones*, 146 Wn.2d at 300. "'A material fact is one upon which the outcome of the litigation depends, in whole or in part.'" *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 861, 93 P.3d 108 (2004) (quoting *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980)).

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). A party may move for summary judgment by (1) setting out its own version of the facts and alleging that there is no genuine issue as to the facts as set out, or (2) by

pointing out that the nonmoving party lacks sufficient evidence to support its case. *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 350, 144 P.3d 276 (2006); *Guile v. Ballard Cmty. Hosp.*, 70 Wn. App. 18, 21, 851 P.2d 689 (1993).

If the moving party satisfies its burden, the nonmoving party must present evidence demonstrating that a material fact remains in dispute. *Vallandigham*, 154 Wn.2d at 26. The nonmoving party may not rest on mere allegations or denials from the pleadings. CR 56(e). The response, by affidavits or as otherwise provided under CR 56, must set forth specific facts that reveal a genuine issue for trial. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359, 753 P.2d 517 (1988). "[C]onclusory statements of fact will not suffice." *Grimwood*, 110 Wn.2d at 360. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). If the nonmoving party fails to demonstrate that a material fact remains in dispute, and reasonable persons could reach but one conclusion from all the evidence, then summary judgment is proper. *Vallandigham*, 154 Wn.2d at 26.

We may affirm on any ground the record adequately supports. *Skinner v. Holgate*, 141 Wn. App. 840, 849, 173 P.3d 300 (2007).

II.    WILL CONTEST CLAIMS

Martin argues that the trial court erred by dismissing his undue influence and fraud claims on summary judgment because material factual disputes remain. He also argues that the trial court applied an incorrect standard in deciding the summary judgment motion. We disagree.

Martin argues that the trial court incorrectly considered the clear, cogent, and convincing evidentiary standard in deciding the summary judgment motion. We disagree.

7

A party claiming undue influence or fraud must prove its claim by clear, cogent, and convincing evidence. *In re Estate of Lint*, 135 Wn.2d 518, 535, 957 P.2d 755 (1998); *In re Estate of Mumby*, 97 Wn. App. 385, 391, 982 P.2d 1219 (1999). A trial court ruling on a motion for summary judgment must view the evidence presented through the lens of the substantive evidentiary burden, "bear[ing] in mind the actual quantum and quality of proof necessary to support" the plaintiff's claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (holding that heightened evidentiary standard must be considered in deciding a summary judgment motion to dismiss a libel suit). Therefore, on a motion for summary judgment, the trial court must determine whether there is a genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law. CR 56(c). In an undue influence or fraud claim, a party is entitled to a judgment as a matter of law if the clear, cogent, and convincing evidence standard is satisfied. . *Kitsap Bank v. Denley*, 177 Wn. App. 559, 569, 312 P.3d 711 (2013); *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008); *accord Anderson*, 477 U.S. at 252.

Here, we view the evidence in the light most favorable to Martin. *Jones*, 146 Wn.2d at 300. Heberlein's summary judgment motion should be granted if there is no issue of material fact and reasonable persons could reach but one conclusion from all the evidence, that the will was not the product of undue influence or fraud by clear, cogent, and convincing evidence.[3] *See Kitsap Bank*, 177 Wn. App. at 569-70. In order to defeat a summary judgment dismissal of his will contest claims, Martin must show that there is a genuine issue of material fact as to whether Bob's 2010 will was the product of undue influence or fraud by clear, cogent, and convincing evidence. *See*

---

[3] Martin contends that the standard set forth in *Kitsap Bank* was not the law when the trial court dismissed his claims. *Kitsap Bank* did not announce a new summary judgment standard.

*Kitsap Bank*, 177 Wn. App. at 569; *Woody*, 146 Wn. App. at 22; *accord Anderson*, 477 U.S. at 252-54.

### A. Undue Influence Claim

Martin argues that the trial court erred by dismissing his undue influence claim because the presumption of undue influence applied and it should have defeated Heberlein's motion. We disagree.

The law presumes that a facially rational, legally executed will is valid. *Dean v. Jordan*, 194 Wash. 661, 668, 79 P.2d 331 (1938). A trial court may set aside a will, however, if a will contestant proves by clear, cogent, and convincing evidence that the will is a product of undue influence. *In re Estate of Haviland*, 162 Wn. App. 548, 557-58, 255 P.3d 854 (2011). To invalidate a will for undue influence, a will contestant must show more than "mere influence." *Dean*, 194 Wash. at 671. "Undue influence involves unfair persuasion that seriously impairs the free and competent exercise of judgment." *In re Estate of Jones*, 170 Wn. App. 594, 606, 287 P.3d 610 (2012). The influence must be "'tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will.'" *Lint*, 135 Wn.2d at 535 (quoting *In re Estate of Bottger*, 14 Wn.2d 676, 700, 129 P.2d 518 (1942)).

Certain facts and circumstances give rise to a rebuttable presumption of undue influence. *Dean*, 194 Wash. at 671-72; *Kitsap Bank*, 177 Wn. App. at 570. The three most important factors are: (1) a fiduciary or confidential relationship between the beneficiary and the testator; (2) the beneficiary's active participation in procuring the will; and (3) the beneficiary's receipt of an unusually or unnaturally large part of the testator's estate. *Dean*, 194 Wash. at 671-72; *Kitsap Bank*, 177 Wn. App. at 570-71. The court should also consider the age and mental and physical health of the testator, the nature of the relationship between the testator and the beneficiary, the

opportunity for exerting undue influence, and the naturalness or unnaturalness of the will. *Dean,* 194 Wash. at 671-72; *Kitsap Bank,* 177 Wn. App. at 571.

Martin argues that he met all three factors necessary to establish a presumption of undue influence. It is undisputed that the record includes significant evidence of a confidential or fiduciary relationship between Heberlein and Bob.[4] But Martin does not present evidence that Heberlein participated in procuring Bob's will or that she received an unusually large or unnatural part of his estate. Therefore, we hold that Martin did not present evidence raising a presumption of undue influence.[5]

---

[4] "'A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind.'" *Kitsap Bank,* 177 Wn. App. at 572 (quoting *McCutcheon v. Brownfield,* 2 Wn. App. 348, 357, 467 P.2d 868 (1970)). "Family relationships are particularly likely to create confidential relationships." *Kitsap Bank,* 177 Wn. App. at 572. Similarly, "[i]n a fiduciary relationship, one party 'occupies such a relation to the other party as to justify the latter in expecting that his interests will be cared for.'" *Kitsap Bank,* 177 Wn. App. at 574 (quoting *Liebergesell v. Evans,* 93 Wn.2d 881, 889-90, 613 P.2d 1170 (1980) (quoting RESTATEMENT (FIRST) OF CONTRACTS §472 (1)(C) (1932) (internal quotations omitted)).

Here, Heberlein and Bob were business partners and domestic partners. They lived together and maintained numerous joint accounts. When Bob was diagnosed with cancer, Bob and Heberlein formalized their relationship by registering as domestic partners and naming Heberlein as Bob's attorney-in-fact for financial and health care decisions. Bob and Heberlein were concerned that without those documents, Heberlein might be separated or excluded from Bob's doctor visits or from the hospital.

[5] We reject Martin's argument that summary judgment was improper because he had raised a presumption of undue influence, and we also conclude that without the presumption, the record as a whole does not present a sufficient disagreement to require submission of the undue influence claim to a jury. *See Anderson,* 477 U.S. at 251-52.

### 1. Participation in Procuring the Will

Martin argues that Heberlein participated in procuring Bob's will because she accompanied Bob to the attorney's office, filled out the initial intake paperwork, and attended meetings between Bob and the attorney where Bob discussed the terms of his new proposed will. The facts that Martin relies on are not evidence of Heberlein's participation in procuring Bob's will because none of them includes her participating substantively as to the terms of the will. *See Kitsap Bank*, 177 Wn. App. at 577 ("Participation in the transaction sufficient to support a presumption of undue influence requires that the beneficiary actively dictated the terms of transaction, purportedly on behalf of the decedent.").

The undisputed evidence shows that Bob initiated the estate planning process in order to provide for Heberlein. After his terminal cancer diagnosis, Bob told Heberlein that he needed a will. He then promptly contacted his friend Sue Holbrook and asked her to recommend an attorney. The fact that Heberlein accompanied Bob to the attorney's office is unremarkable especially because she also had her estate planning documents drawn up. Heberlein filled out the initial consultation paperwork for herself and Bob, but it did not include any information about the proposed terms of Bob's estate planning documents. Heberlein merely facilitated Bob's meeting the attorney. She did not participate in his procuring his estate planning documents.

Although Bob and Heberlein had an initial joint meeting with the attorney, they met separately with the attorney to go over the terms of their individual estate plans. According to the attorney, she met privately with Bob specifically to insure he could speak freely with her. In a private meeting, Bob explained the reasons he sought estate planning, identified his intended primary and alternate beneficiaries, explained why he did not include Martin as an intended beneficiary, and discussed his assets, including designations he had made with regard to

11

nonprobate assets. Furthermore, the attorney filed a declaration stating that Heberlein did not instruct her as to the terms of Bob's estate plan in any respect. Based on the evidence presented, there is no genuine issue of material fact as to whether Heberlein participated in procuring Bob's will.

2.      Unusually or Unnaturally Large Benefit

Martin argues that Heberlein received an unnaturally large portion of Bob's estate under the 2010 will in comparison to Bob's previous will, especially considering that Heberlein and Bob were neither spouse nor domestic partner at the execution of the 2010 will. We disagree.

The naturalness of a gift depends on the individual circumstances of the testator. *In re Miller's Estate*, 10 Wn.2d 258, 267, 116 P.2d 526 (1941). "A will is unnatural when it is contrary to what the testator, from his known views, feelings, and intentions would have been expected to make." *In re Miller's Estate*, 10 Wn.2d at 267. In *Haviland*, we upheld a presumption of undue influence based in part, on a trial court's finding that the wife received an unnaturally large share of her husband's estate compared to his earlier estate plans. 162 Wn. App. at 559, 568. But the unusual facts of *Haviland* made the increased testamentary gift to the wife suspect. The testator in *Haviland*, a very wealthy widower in his mid-eighties, married a woman in her mid-thirties. *Haviland*, 162 Wn. App. at 553. The couple signed a prenuptial agreement to maintain the separate nature of the testator's property, but as the testator became more vulnerable due to physical and cognitive impairments, his wife made numerous revisions to his estate plan. Each change resulted in a greater portion of his estate going to his wife and less going to his children and designated charities. *Haviland*, 162 Wn. App. at 553-55. The last major revision effectively disinherited the testator's children. *Haviland*, 162 Wn. App. at 555.

Martin argues that the gift to Heberlein is unnaturally large because it significantly changed Bob's previous estate plan and disinherited his only son. But here, unlike in *Haviland*, the significant change in Bob's estate plan does not appear suspect or unnatural under the circumstances. The challenged will in *Haviland* constituted a significant and unexplained change. *Haviland*, 162 Wn. App. at 553-55. Here, the change in the testamentary disposition of Bob's property can be explained by changed circumstances. It is not unnaturally large.

Bob executed his prior will more than twenty years ago, well before the beginning of his relationship with Heberlein. Bob met Heberlein in 2003 and began a seven-and-a-half year relationship. They lived together as a couple, worked together, held many of their accounts as joint tenants with right of survivorship, and designated each other primary beneficiaries on their retirement accounts. Within a week of learning that about his terminal illness, Bob acted quickly to ensure his estate plan provided for Heberlein. He executed a will on October 18, 2010, naming Heberlein as the primary beneficiary of his entire estate. The next day, he and Heberlein became registered domestic partners under state law.[6]

Furthermore, since executing his prior will, from Bob's perspective, he had given Martin a house and their relationship had deteriorated. Martin contends that he purchased the house from Bob and that his criminal history could not have been a reason to disinherit him because it predated the prior will. However, Martin's allegations do not create a material issue of fact because the undisputed evidence presented shows that Bob's expressed perspective was that he had already provided for Martin in the form of a house and that Martin was not deserving of additional gifts.

---

[6] We note that registered domestic partners share the status of spouses under state law. *See* RCW 26.60.015; *In re Custody of B.M.H.*, 179 Wn.2d 224, 263, 315 P.3d 470 (2013) (J. Wiggins, dissenting).

Bob repeatedly and consistently made it clear to his friends and family that he intended to provide for Heberlein after his death. Prior to executing his 2010 will, Bob told Sue and Joe Holbrook that he intended to provide for Heberlein. And after executing the will, Bob told his sister and Johnson that he had provided for Heberlein in his will. Based on the evidence presented, we conclude that reasonable minds could not differ and there is no genuine issue of material fact about whether Bob's leaving his entire estate to Heberlein was unnatural. Bob did not leave an unnaturally large amount of his estate to Heberlein.

### 3. Other Factors

Martin argues that additional factors support the presumption of undue influence. Specifically, Martin claims that Heberlein had the opportunity to exert undue influence over Bob because of his poor health and isolation from friends and family. We disagree.

Although Bob suffered physically at the time that he executed his will, the evidence shows that his symptoms, e.g. fatigue, headaches, coughing, coughing up blood, did not impact him in any way that made him susceptible to undue influence. The declarations of Heberlein, Bob's sister, and various friends all support that other than breathing problems, Bob functioned normally until the last few days of his life. Martin does not present any evidence about Bob's health or vulnerabilities near the time Bob executed the 2010 will.

In addition, Martin did not present evidence that raised a genuine issue of material fact about whether Heberlein isolated Bob from friends and family near the time Bob signed the 2010 will. Declarations from Bob's friends and sister showed that they communicated with Bob during October and November 2010, that he worked as a realtor, and that Bob even called Martin a few times.

The allegations of Martin's wife and children portray a general distancing between Bob and his family in the last few years of his life and not a situation where Heberlein secreted Bob. In fact, the only specific allegation of Heberlein excluding Martin or anyone else from communicating with Bob occurred during Bob's hospitalization in the last few days of his life. Heberlein disputes that she excluded Martin from seeing Bob in the hospital, but even if she did, it took place in an extraordinary time when Bob was very close to death. Furthermore, it occurred more than a month after he executed the 2010 will. Based on the evidence presented, there is no genuine issue of material fact about whether Heberlein isolated Bob to the extent that it created an opportunity for her to exert undue influence over him during the time he executed his 2010 will.

Martin failed to raise a genuine issue of material fact for trial. Viewing the evidence presented in the light most favorable to Martin, no reasonable factfinder could conclude that Martin presented clear and convincing evidence that raised either a presumption of Heberlein's undue influence or of Heberlein's actual undue influence over Bob when he executed his 2010 will. The trial court did not err by dismissing Martin's undue influence claim on summary judgment.

B.     Fraud

Martin claims that the trial court erred in dismissing his fraud claim on summary judgment. He claims that he presented facts raising a presumption of fraud in the inducement,[7] but even if no presumption applied, material issues of fact existed that prevented the trial court from granting Heberlein's motion. We disagree.

"[F]raud in the inducement" is "[f]raud occurring when a misrepresentation leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved."

---

[7] Martin does explain which facts raise a presumption of fraud. But to the extent he relies on the same factors as in the undue influence context, he fails to raise a presumption of fraud for the same reasons he failed to raise a presumption of undue influence.

BLACK'S LAW DICTIONARY 776 (10th ed. 2014). A court may set aside a will if the will was induced by fraudulent representation of a person benefitting from the will. *Lint*, 135 Wn.2d at 533. The elements of fraud are: (1) representation of an existing fact; (2) materiality of the representation; (3) falsity of the representation; (4) knowledge of the falsity or reckless disregard as to its truth; (5) intent to induce reliance on the representation; (6) ignorance of the falsity; (7) reliance on the truth of the representation; (8) justifiable reliance; and (9) damages. *Lint*, 135 Wn.2d at 533 n.4. The general rule is that fraud is never presumed. *Beckendorf v. Beckendorf*, 76 Wn.2d 457, 462, 457 P.2d 603 (1969). The challenger must prove the elements of fraud by clear, cogent, and convincing evidence in order to have the will set aside. *Lint*, 135 Wn.2d at 533.

Martin claims that Heberlein misrepresented to Bob that Martin and his family only desired Bob's money, which resulted in Bob disinheriting Martin. Heberlein moved for summary judgment and met her initial burden. She presented evidence of the absence of fraud, *i.e.* that Bob's will expressed his true desire to provide for her and reasons for disinheriting Martin, *e.g.* Bob had already given Martin a house. In support, Heberlein presented declarations from Bob's friends and his sister describing Bob's expressed desire to provide for Heberlein. She also presented a declaration from Bob's attorney stating that Bob told her that he was disinheriting Martin because Martin was a "bad seed" who had brought drugs to a family event and that he had already been provided for in the form of a gift of a house. CP at 82.

As the nonmoving party, Martin needed to present specific facts demonstrating that a material fact remained in dispute. *See* CR 56(e); *Vallandigham*, 154 Wn.2d at 26. He did not. Although Martin alleges that Heberlein's misrepresentations to Bob about him and his family induced the 2010 will, he does not support his allegations with cites to the record. Martin also disputes Bob's stated reasons for excluding him in his new estate plan and claims that Bob's

16

opinions were based on false information fed to him by Heberlein. But again, Martin fails to cite to specific evidence of Heberlein's misrepresentations.[8]

Our independent review of the record also shows that Martin failed to present evidence of a sufficient quantity or quality to survive summary judgment. In an interrogatory, Heberlein asked Martin to identify with particularity all statements made by her that he contends are false and misleading, including the dates of the statements and the source of his knowledge about the statements. Martin's conclusory response did not reveal the basis for his knowledge:

> The Personal Representative set the stage for the Decedent to think he should change his Will. As set forth very explicitly in the Petition, the Personal Representative made affirmative statements to the Decedent that Mr. Thornton only desired a relationship with the Decedent for his money. Based on the information provided in this probate through Desiree Hosanna[h] and the information already provided by the Personal Representative, it is clear that her position is that Mr. Thornton only desired money and assets from his father.

CP at 119-20. Although Martin may not rest on allegations from his pleadings, it is worth pointing out that in his petition, he did not identify with particularity any statements made by Heberlein:

> Based on information and belief, Ms. Heberlein made numerous allegations of material facts to the Decedent about Mr. Thornton which were false and misleading including, but not limited to, that Mr. Thornton and his family were only interested in the Decedent for the Decedent's assets. The statements made by Ms. Heberlein to the Decedent regarding Mr. Thornton and his family were made with the intent and design to persuade the Decedent to change his estate plan to remove Mr. Thornton as the sole beneficiary and replace him with Ms. Heberlein.

CP at 5. Martin did not present any nonconclusory evidence of the alleged misrepresentations that Heberlein made to Bob or any evidence that the alleged misrepresentations formed the bases for

---

[8] Martin provides evidence that he purchased the house from Bob rather than receiving it as a gift. But Martin and Bob's disagreement on the nature of the transaction does not raise a material factual dispute because Martin has not shown that Bob's opinion was based on a misrepresentation made by Heberlein. Moreover, it would be difficult for Heberlein to have misrepresented to Bob the nature of a transaction that occurred between Bob and Martin more than five years before the beginning of Heberlein and Bob's relationship.

Bob's testamentary disposition.

Martin cites to *Lint*, 135 Wn.2d at 533, for support. In *Lint*, our Supreme Court upheld a trial court's conclusion that a challenged will was the product of fraud based on its factual findings that the beneficiary systematically and pervasively isolated the testator from friends and family and told her that her family only wanted to put her in a convalescent home and get their share of her estate. 135 Wn.2d at 533-34. Martin draws parallels between the facts of *Lint* and the alleged facts of this case. But Martin fails to put forth evidence of his allegations sufficient to survive summary judgment.

Because Martin failed to produce evidence of particular misrepresentations made by Heberlein that induced Bob to make his 2010 testamentary disposition, he did not show that a genuine issue of material fact remained for trial.[9] Therefore, the trial court did not err by granting summary judgment dismissal of Bob's fraud claim.

III. CONSTRUCTIVE TRUST ON NON-PROBATE ASSETS

Martin argues that the trial court erred by granting summary judgment dismissal of his constructive trust claim based on a statute of limitations that does not apply. Although the basis for Martin's constructive trust claim over nonprobate assets is vague, we accept his concession that his constructive trust cause of action is dependent on the success of his will contest claims. In his reply brief, Martin explains that "[h]is [constructive trust] claim was that the Court impose a

---

[9] Martin also alleges that Heberlein furthered her fraud by isolating Bob from his family. The evidence related to this allegation was discussed briefly in the section on undue influence. Isolation of a testator may support a claim of fraud, primarily because an isolated testator is more likely to be affected by a misrepresentation. *See Lint*, 135 Wn.2d at 534. However, Martin's allegation of isolation does not require additional analysis because Martin's failure to present evidence of a misrepresentation by Heberlein, a necessary element of fraud, necessarily renders all other facts immaterial. *See Celotex Corp*, 477 U.S. at 323; *Lint*, 135 Wn.2d at 533. Martin's fraud claim fails as a matter of law.

constructive trust over any such assets *if it is determined that the 2010 Will is invalid.*" Reply Br. at 17 (emphasis added). Because we affirm the trial court's dismissal of Martin's will contest claims, we do not decide the constructive trust statute of limitations issue. We uphold the trial court's summary judgment dismissal of Martin's constructive trust claim, albeit on a different ground than the trial court relied on to grant summary judgment. *See Skinner*, 141 Wn. App. at 849.

IV.    ATTORNEY FEES AT TRIAL COURT LEVEL

In any title 11 RCW action, courts have discretion to award costs, including reasonable attorney fees to any party from any party in such amount and in such manner as the court determines to be equitable. *In re Guardianship of Matthews*, 156 Wn. App. 201, 213, 232 P.3d 1140 (2010). In exercising its discretion, the court may consider any and all factors that it deems relevant and appropriate. RCW 11.96A.150. We review a trial court's decision to award fees under TEDRA for abuse of discretion. *Bale v. Allison*, 173 Wn. App. 435, 461, 294 P.3d 789 (2013); *In re Estate of Black*, 153 Wn.2d 152, 173, 102 P.3d 796 (2004).

The trial court awarded Heberlein, in her individual capacity, attorney fees for work done in relation to her successful summary judgment motion on Martin's claim for a constructive trust on nonprobate assets. The trial court found that $9,497.50 in fees were reasonable and necessarily incurred for the successful outcome in the summary judgment motion or the collection of attorney fees related to that motion.

Martin argues that the award should be reversed. He argues that the fee award was unwarranted because the basis for the trial court's summary judgment ruling was incorrect and that even if it was correct, it would be an issue of first impression. Although we upheld dismissal of the constructive trust claim without deciding the statute of limitation issue, we conclude that the

trial court's rationale for making the fee award still applies with equal strength. Martin's constructive trust claim was extremely vague and it was not until his reply brief to this court that he clearly articulated that his constructive trust claim was dependent on the success of his will contest claims. Therefore, we conclude that the fees award was reasonable and necessarily incurred for a successful summary judgment dismissal of Martin's claim. Accordingly, we uphold the trial court's fee award related to summary judgment of the constructive trust claim.

The trial court also awarded the Estate attorney fees for work done in relation to the successful summary judgment motion of Martin's will contest claims. Martin concedes that the trial court's award was appropriate if its summary judgment ruling stands. Because we agree with the trial court's summary judgment ruling on the will contest claims, the attorney fee award against Martin remains intact.

V.   ATTORNEY FEES ON APPEAL

The Estate and Heberlein request attorney fees on appeal under RCW 11.24.050 and RCW 11.96A.150. Martin requests attorney fees on appeal under RCW 11.96A.150.

RCW 11.24.050 provides that in an unsuccessful will contest "the court" may assess against the contestant such costs the court may deem proper, including reasonable attorney fees, unless it appears that the contestant acted with probable cause and in good faith. RCW 11.96A.150 allows the superior court and any court on an appeal to make an award in estate dispute resolutions in the court's discretion "as the court determines to be equitable."

We decline to award reasonable attorney fees on appeal to either party under RCW 11.96A.150. If RCW 11.24.050 applies on appeal, we decline to award reasonable attorney fees under that statute as well.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:


_____
Bjorgen, A.C.J


_____
Gordon McCloud, J.P.T.